And we'll turn to the next case on our calendar, Pllumaj v. Sessions. Good morning. May it please the Court, my name is Greg Marotta. I represent the petitioner, Flora Pllumaj. This is a petition for review of an immigration matter where the board and the immigration judge denied asylum. The petitioner is an Albanian citizen seeking asylum based on past persecution because of his political opinion. We're asking the Court to remand the case back to the agency to reconsider the negative credibility finding in light of the recent decision by a panel of this Court in the Gow case. The Gow case states that the immigration judge, which is actually the same immigration judge in this matter, Judge Loprest, based the negative credibility finding on trivial and inconsequential omissions and we have similar matters in this case. Are the inconsistencies in this case trivial and inconsequential? I think they are, Your Honor. The petitioner mainly fumbled some dates. The first date he fumbled, one of the first questions he was asked was when he joined his political party. And all the documentation in the record says it was 2011. He said it was 2012. And he maintained that throughout the hearing. So that's also part of the demeanor issue. The judge made a negative credibility finding based on his demeanor because he was having trouble answering questions because his own attorney kept asking him, are you sure it's 2012? And he kept saying, yes, 2012. And then there was another date issue. He said September instead of October. So he seemed to be fumbling around because he made what are basically innocent mistakes. There was a lot of information in this record. He and his family had been persecuted for years, generations. So there was a lot to go over. And he did fumble some dates. The government attorney was a seasoned trial attorney and the way she was asking questions made him seem not credible. For instance, the credible fear interview, there was a question, the second beating, did your assailant say anything to you before they beat you? And he said no in the credible fear interview. During live testimony, he said while they were beating me, they were telling me why they were beating him. That's not trivial, actually, because that goes to the heart of his claim, doesn't it? Well, to me, it's not inconsistent. Whether they said anything before they beat me. It's not inconsistent, but it's a trivial difference in the testimony. At the credible fear interview, he neglected to mention that this longstanding persecution was because of his membership in this party. That's not trivial to me. Well, he wasn't asked the question whether they said anything while they were beating him. No, but did they ask why he was being beaten? I don't recall. I don't want to belabor the point. I just think that this is sort of outside the realm of what Gao was talking about, but go on. Well, I consider it, I mean, it is a little different than Gao, but it is an omission that in the credible fear interview, the problem with the credible fear interview is they don't ask all the questions. It's a very low burden to show a credible fear. So it seems once they have enough information, they stop the interview. So the additional information that he gave during direct testimony and in his statement are not, I don't find them inconsistent. It's just more information, which I consider not inconsistent. You started off by saying the dates, 2011, 2012. Anybody can make that mistake. What about the identity card issue though? His father had been a member for a long time. I think he was head of the local chapter, but the identity cards were sequential. It seems a bit odd that they would be. And is it that you say they were reissued every year? Is that it? Is that your argument? That's they just happened to go to the, say, go to more vehicles the same time or something? That's what I think happened. He said they were reissued. I think he called back home and asked for documentation. His father went and got the cards reissued and they were probably done together. So, and that also leads me to another inconsistency. Is that the only card he had though, the sequential card? Wouldn't he have had an earlier card before they were renewed? I don't recall, Judge. But that brings up another point where the judge asked him to describe the card and he couldn't describe the card. And I just think that's an improper reason to say that he's not credible, the fact that he couldn't describe it. He couldn't describe the insignia either of his party, right? Right. I mean, that was one of the reasons why, because it was not stamped on the card, right? Right. But I don't think that's a good reason. I mean, I have documents in my wallet. I looked this morning, I gave myself a test. I looked at my driver's license and there's a picture of the New Jersey State Capitol on my driver's license. I couldn't have told you that before I looked at it. It's been in my wallet for 10 years. So I don't think that's a reasonable, cogent reason to find him not credible, the fact that he couldn't describe his membership card. And the other issue was which hospital he went to. But it wasn't that he couldn't describe it. He gave a wrong description, right? That's true. He said it was a round red with stars and said PDK on it, but it doesn't. That's correct. He gave an incorrect description. He couldn't describe it. He described it incorrectly. Yes. The other perceived inconsistency was where he went to the hospital. He was first asked where he went to the hospital. He said, I went to a hospital in Tamir. It's a clinic. And the trial attorney got him to say that it was Tamir Hospital. The trial attorney asked him the question, did you say you went to Tamir Hospital? He said, yes, when actually it was a clinic. And I don't think he was trying to be deceptive. It doesn't look like he was trying to be deceptive because he initially said it was a clinic and he knew the name of the doctor that treated him. So I don't think that is a good reason to find him not credible either. I think that's all the inconsistencies. Well, you can reserve this time as well. Thank you, Your Honor. Ms. Winston. May it please the Court, Colette Winston for Acting Attorney General Whitaker. The issue here is whether considering the totality of the circumstances, the record compels reversal of the agency's adverse credibility determination, where there were unexplainable discrepancies between Mr. Ploumai's credible fear interview, his asylum application, his statement and his testimony, and he displayed questionable demeanor. There were seven inconsistencies in total, not mere omissions, not mere supplementations like in the Gao case, but inconsistencies, four of which were noted by the immigration judge and the board, three of which were noted just by the immigration judge. In this case, substantial evidence supports the adverse credibility determination by the agency. The first inconsistency was the date of his CDP membership. This was not trivial. In his testimony, as counsel stated, he insisted several times that the year was 2012, while in his asylum application, his personal statement, his credible fear interview, and an independent letter from the chairman of the CDP, it was stated that he became a member in 2011. Now, this is not trivial, because he had two incidents that occurred to him, and one was in 2011, on October 6th, on September 20, 2011, and one was in 2011. So it's not just a memory failure, either, you're arguing. Why would he do this? To what end? What was he trying to accomplish, if it was an intentional lie? I'm not so sure. I mean, it was an inconsistency. It was a discrepancy. And maybe standing alone, it wouldn't have carried the day for an adverse credibility determination. But there are cases even decided after Gao. There are six cases decided after Gao. And one of them did talk about a date, the Singh case, the date when problems began with the political party. And that was not seen as trivial. That was seen as an important inconsistency that supported the adverse credibility determination. I know, but what does this inconsistency lead to? A belief that Mr. Plumage was lying? Why would he lie about the year he joined? Why would he make it later, rather than sooner, if he was trying to gain admission into this country? I don't understand why it wouldn't be simply a failure of memory on the date. I mean, it may be an inconsistency, but it's more naturally understood as, just, he forgot. Or confusion. All right, go on. But if it stood alone, maybe that would certainly have been overlooked by both the immigration judge and the board. But in addition, as to the October 2012 attack, in his credible fear interview, he was asked, what did they say before they beat you, his assailants? And he said, they didn't say anything, and beat me, on page 430. However, in his testimony, he flipped it. He filled it in, in a different way. And he said, they told me that you're getting these beatings because of your membership in the CDB. So opposing counsel said that this was non-inconsistent. I mean, it could be the same beating, with different information. But I tend to agree that it's not trivial. I mean, if this was the motivation to try and get asylum, it's important that they get it. But they said they were beating him because he was a member of this committee. Exactly. And it's important, not because it goes to the heart of the claim, which was the standard before the Real ID Act, but was important because it was not something like a small interrogation window that was omitted in the Gao case. Something extremely insignificant. Also, he didn't know the name of the current CDB president. You would think that someone who left his country, Albania, left his family, left his culture, left his language, because of his connection with the CDP, that was the whole reason for his leaving of his country, according to him, would certainly kind of stay abreast of what was going on with his political party that was so important to him. But he couldn't say that. He was also, as Your Honor pointed out, unable to describe the CDP symbol on his card. It's not that we can describe everything in our wallet. We couldn't. But this is the political party that he put up posters for, that he distributed flags for, he distributed pamphlets. You would think that he would know the symbol of his party, of his political party that was so important to him. In addition, the immigration judge noted that he wasn't able to really state who his persecutors were. In his credible fear interview and in his asylum application, he called his persecutors the Socialist and Democratic Party members. Yet in his testimony, he called them social militants. So if he belonged to the Democratic Party, his assailants wouldn't be Democratic Party members. So it's another drop in the adverse credibility bucket, which is the totality, the bucket is the totality of the circumstances. Also he stated that he regained consciousness at Tamar Hospital. But the medical report in the record said he refused to go to a hospital. It was a clinic. And his explanation didn't make sense because he said in Albanian, clinic and hospital are interchangeable. But in the very document, they made a distinction. When they said he refused to go to a hospital, obviously clinic and hospital were different, were not interchangeable. And then the sequential numbering on his membership cards. His father had joined years earlier. Even if they renewed their cards together, the immigration judge wasn't convinced that the membership number was going to change as a result of that. And one of the explanations that Mr. Plamei gave to the immigration judge was they were modernizing the card. But if they modernized the card, the immigration judge found it very suspect that the father's picture was the same. And it was a picture of a younger man. And that wasn't changed. So the sequential numbering just added another drop in that adverse credibility bucket. On top of that, the immigration judge noted that he lacked candor, that he was not responsive. His demeanor was suspect. He was uncooperative. He was hesitant when confronted with the inconsistencies. And he asked for deference. And the board found that there was no error in the immigration judge's finding. Particular deference should be given to adverse credibility determinations. And as well as determinations based on demeanor. And that's the Liu case and the Lin case. And the court should not substitute its judgment for the immigration judge's determination. As long as the totality of the circumstances support the adverse credibility determination. So in conclusion, based on inconsistencies, not omissions like the Gao case, but inconsistencies between the testimony and his asylum application, his credible fear interview, his asylum statement, and his suspect demeanor, the agency's adverse credibility determination is supported by substantial evidence. And the petition for review here should be denied. Thank you. Thank you. Mr. Morota? Just a couple things, Your Honor. Mr. Poulmai was unable to say who the current president was. I don't find that telling. He left this country. He was traumatized from what happened to him. I don't think it's unreasonable to say that he would turn his back on politics in his country. He's trying to make a life here. Trying to make a living. I don't think that's significant. So it was 2013 he entered this country, right? It was 2015, the IJ hearing? Yes. And this demeanor and lacking candor, hesitant testimony, I think it's explainable because he was being cross-examined by a trial attorney with nearly 20 years of experience, knows how to ask questions, and she was attacking him. So I think when you're being attacked and you're being told you're making mistakes, it's natural that you would be hesitant and you're being told something different. I still say that this credible funeral interview is not inconsistent. The statement that they didn't say anything and they beat me is different than they didn't say anything, they beat me, and then while they were beating me they said where they were from. I don't think it's inconsistent. When he initially testified on direct examination about that beating, he said, they came up to me immediately and started beating me, and then they said why they were beating him. I don't think it's inconsistent. I think that you hear in the media that immigration matters are like a murder trial in traffic court, and that's what this case feels like. The trial attorney and the judge were working through lunch, it feels like they were rushing through it, and it looks like it was a well-documented case that was going to be granted and it should have been granted. And Mr. Pulmai made a mistake and the case went downhill and I think the trial attorney just was attacking him, making him make more mistakes. So I would ask that the petition be granted. Thank you very much. Thank you. We'll reserve the decision.